**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| | ) | **No. 05 C 6386** |
| **v.** | ) | |
| | ) | **Judge Gottschall** |
| | ) | |
| **NWI-I, INC. (F/K/A FRUIT OF THE LOOM INC.), LEPETOMANE II, INC., as Trustee of the Fruit of the Loom Successor Liquidation Trust, and LEPETOMANE III, INC., as Trustee of the Fruit of the Loom Custodial Trust.** | ) ) ) ) ) ) ) | **Mag. Judge Michael T. Mason** |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

This matter comes before the Court on two discovery motions. Plaintiff, American International Specialty Lines Insurance Company ("AISLIC"), filed a motion to compel responses to plaintiff's first set of document requests and interrogatories. Defendants, NWI-I, LePetomane II, Inc., as Trustee of the Fruit of the Loom Successor Liquidation Trust ("SLT") and LePetomane III, Inc., as Trustee of the Fruit of the Loom Custodial Trust ("CT"), filed a motion for protective order and to determine the attorney-client privilege. For the reasons set forth below, defendants' motion for protective order and to determine the attorney-client privilege is granted in part and denied in part and plaintiff's motion to compel is granted in part and denied in part.

**Background**

This case involves a $100,000,000 pollution legal liability insurance policy ("the

Policy") issued by AISLIC to Fruit of the Loom, Inc. ("Old FTL") in 1998. The Policy covers seven contaminated properties (the "Seven Properties") formerly owned by Old FTL or other affiliated corporations that have gone through Chapter 11 bankruptcy reorganization. Plaintiff seeks a declaration that defendants are not entitled to coverage under the Policy. Defendants filed a counterclaim alleging that plaintiff is obligated to pay the full policy limit for remediation costs associated with the Seven Properties.

On December 29, 1999, Old FTL, NWI Land Management Corp. ("NWI") and thirty affiliates (collectively, "the FTL debtors") filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware ("the FTL Bankruptcy"). The United States Environmental Protection Agency ("EPA") and several state environmental agencies filed proofs of claim in the bankruptcy proceedings, alleging that Old FTL owed them money for clean-up work conducted at several sites covered by the Policy.

The defendants in this action are among several successors of Old FTL to emerge from the FTL Bankruptcy. On March 19, 2002, the bankruptcy court confirmed the Third Amended Plan of Joint Reorganization ("the Joint Plan"). According to the Joint Plan, the successors of Old FTL after bankruptcy were: (1) the FTL Liquidation Trust, a/k/a the FOL Liquidation Trust; (2) the Unsecured Creditors Trust; (3) the NWI Successor, now known as the Successor Liquidation Trust ("SLT"); (4) the Custodial Trust ("CT"); (5) Reorganized Fruit of the Loom, which consisted of Reorganized Debtors, Newco and any successor; and (6) Newco, to which the Apparel Business

Assets were transferred (referred to herein as "New FTL").[1]

In or around April 2002, Old FTL and NWI entered into a settlement agreement ("the Environmental Settlement Agreement") in the FTL Bankruptcy that resolved certain environmental claims. The Environmental Settlement Agreement provided that the Seven Properties would be transferred to the CT. The CT was created pursuant to the Joint Plan and the Custodial Trust Agreement to own the Seven Properties, carry out administrative functions regarding the Seven Properties and to manage and/or fund remedial actions on those properties. The SLT was created pursuant to the Joint Plan and the Successor Liquidation Trust Agreement to hold certain assets of NWI and Old FTL and to distribute its assets to provide funding to the CT. Old FTL changed its name to NWI-I and became a wholly-owned subsidiary of the SLT. The assets currently held by NWI-I consist of equity interests in NWI and certain insurance policies, including the Policy at issue in this litigation.

According to the Environmental Settlement Agreement, the SLT is the legal successor in interest to certain rights under the Policy. Furthermore, pursuant to the Successor Liquidation Trust Agreement, the assets transferred to the SLT include both the stock of NWI-I and the rights, claims, or interests of Old FTL or NWI under the contracts to be assumed and/or assumed and assigned by NWI and Old FTL to the SLT (consisting of, among other insurance policies, the Policy at issue here).

---

[1] The Apparel Business Assets were transferred to Berkshire Hathaway, Inc. pursuant to an Asset Purchase Agreement dated November 1, 2001. The Apparel Business Assets consisted of substantially all of FTL's business operations, including the FTL name and equity interests in FTL. Berkshire Hathaway, Inc. created a new wholly-owned subsidiary named "Fruit of the Loom" ("New FTL"). New FTL continues to operate Old FTL's business operations.

Both the Custodial Trust Agreement and the Successor Liquidation Trust

Agreement include a section entitled "Preservation of Privilege."  This section provides:

> In connection with the rights, claims and causes of action that
> constitute the [Successor Liquidation Trust Assets or the
> Custodial Trust Assets], any attorney-client privilege, work-
> product privilege, or other privilege or immunity attaching to
> any documents or communications (whether written or oral)
> transferred to the [SLT or CT] shall vest in the [SLT or CT] and
> its representatives, and the Parties are authorized to take all
> necessary actions to effectuate the transfer of such privileges.

During the FTL Bankruptcy, the FTL debtors were represented by Milbank,

Tweed, Hadley & McCloy LLP ("Milbank").  Saul Ewing LLP ("Saul Ewing") served as

local counsel.  After confirmation, Milbank represented the FOL Liquidation Trust.

Milbank did not represent NWI-I or the SLT, except for a brief engagement representing

the SLT, with permission of its client, for the limited purpose of clarifying a portion of the

Joint Plan that Milbank had drafted.

**Motion for Protective Order**

In June 2006, plaintiff served subpoenas on the law firms that represented the

FTL debtors in the bankruptcy proceedings.  The subpoenas requested thirty-eight

categories of documents.  In early August 2006, Milbank contacted counsel for

defendant NWI-I to advise her that Milbank had already produced some documents in

response to plaintiff's subpoena but that it had withheld others on attorney-client

privilege grounds.  Counsel for NWI-I instructed Milbank to continue to assert all

applicable privileges on behalf of NWI-I.

Counsel for defendants subsequently informed Milbank that based on the terms

of the Joint Plan and the minimal assets that were transferred to NWI-I, she did not

believe that NWI-I had "succeeded" to the attorney-client privilege between the FTL debtors and Milbank. However, while defense counsel did not believe that the pre-confirmation attorney-client privilege between Milbank and the FTL debtors belonged to NWI-I after confirmation, she advised that it was possible that a privilege may belong to the SLT and the CT with respect to the assets transferred to them under the Successor Liquidation Trust Agreement and the Custodial Trust Agreement. Accordingly, defense counsel requested that Milbank continue to assert all applicable privileges for any documents that relate to Successor Liquidation Trust Assets and Custodial Trust Assets.

Defendants argue that it is unclear what attorney-client privilege, if any, exists between any of the defendants and Old FTL's attorneys, both pre-bankruptcy and during the bankruptcy, specifically with respect to the Policy, the Seven Properties, the Environmental Settlement Agreement and the August 9, 2002 Order that are at issue in this litigation.[2] Furthermore, defendants contend that it is not clear who holds the attorney-client privilege when, as was the case in the FTL Bankruptcy, a debtor's assets are transferred to multiple successor entities. Therefore, defendants ask this Court to determine the extent of any attorney-client privilege held by the defendants, individually or collectively.

Defendants argue that this determination is pivotal to a proper evaluation of their

_____

[2] Defendants fail to explain the August 9, 2002 Order in their motion for protective order. However, according to the complaint, attached as Exhibit 1 to Joel Kurtzberg's affidavit, on or about April 5, 2002, FTL and NWI filed a motion in the bankruptcy court for approval of the terms of the Environmental Settlement Agreement ("the Approval Motion"). The bankruptcy court granted the Approval Motion on August 9, 2002. We assume that this is the August 9, 2002 Order referred to in defendants' motion for protective order.

ongoing obligations to respond to plaintiff's other discovery requests. A privilege issue

such as this one typically arises in the context of a motion to quash brought by either

the defendants or the law firm or a motion to compel brought by the plaintiff. Plaintiff

argues that defendants' motion for protective order is unnecessary and unwarranted

because no one has moved to quash the subpoenas and because defendants have not

identified any specific documents over which they are asserting a claim of privilege.

Both contentions are true. However, this Court finds that plaintiff's motion to compel

brings the attorney-client issue to the forefront. Indeed, as plaintiff states in the motion

to compel, plaintiff's document requests call for defendants to search for and produce

responsive documents from outside counsel to Old FTL during the bankruptcy because

such documents are in defendant NWI-I's control. Even if the motion to compel did not

raise the attorney-client privilege issue, clearly this is an issue that must be resolved in

order to streamline discovery in this case. Therefore, we find it appropriate to address

defendants' motion for protective order at this time.

Defendants ask this Court to find that: (1) NWI-I retains the attorney-client

privilege as it pertains to the Policy; (2) the SLT and the CT retain the attorney-client

privilege as it pertains to the environmental condition and remediation of the Seven

Properties; and (3) NWI-I, the SLT and the CT retain the attorney-client privilege as it

pertains to the Environmental Settlement Agreement and the August 9, 2002 Order.

We begin our analysis with the United States Supreme Court's decision in

*Commodity Futures Trading Comm'n. v. Weintraub,* 471 U.S. 343, 105 S. Ct. 1986

(1985). The issue in *Weintraub* was whether the trustee of a corporation in bankruptcy

had the power to waive the debtor corporation's attorney-client privilege with respect to

communications that took place before the filing of the petition in bankruptcy. The Court noted that "for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Id.* at 348. Furthermore, the Court stated that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349. Indeed, "new managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Id.*

The Court found that because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the person whose duties most closely resemble those of management should control the privilege in bankruptcy. *Id.* at 351-52. The *Weintraub* court noted that the Bankruptcy Code gives the trustee wide-ranging management authority over the debtor while the debtor's directors retain virtually no management power during bankruptcy. *Id.* at 352. Therefore, the Court found that the "trustee plays the role most closely analogous to that of a solvent corporation's management." *Id.* at 353. Accordingly, the *Weintraub* court held that "the trustee of a corporation in bankruptcy has the power to waive the corporation's attorney-client privilege with respect to pre-bankruptcy communications." *Id.* at 358.

Following the rationale of *Weintraub*, several courts have found that the power to invoke or waive a corporation's attorney-client privilege is an incident of control of the corporation. *In re Grand Jury Subpoenas*, 734 F. Supp. 1207, 1211 (E.D. Va. 1990), aff'd in relevant part, 902 F.2d 244 (4th Cir. 1990) (finding that "the principle that

emerges from *Weintraub* and the subsequent decisions is that 'when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well.'"); *Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 472 (W.D. Mich. 1997) (recognizing that invoking or waiving the corporation's privilege is an incident of control of the corporation); *NCL Corp. v. Lone Star Bldg. Ctrs., Inc.,* 144 B.R. 170, 174 (S.D. Fla. 1992) (noting that the right to assert the attorney client privilege is an incident of control of the corporation and remains with the corporation as it undergoes mergers, takeovers, and name changes); *Graco Children's Prods. v. Regalo Int'l LLC*, 1999 U.S. Dist. LEXIS 11392, *10-11 (E.D. Pa. 1999) (stating that the authority to invoke or waive the corporation's attorney-client privilege follows the passage of control of the corporation); *In re In-Store Advertising Sec. Litig.*, 163 F.R.D. 452, 458 (S.D.N.Y. 1995).[3]

In the same regard, after *Weintraub*, several courts have recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege. *See In re Financial Corp. of Am.*, 119 B.R. 728 (Bankr. C.D. Cal. 1990) (holding that the authority to assert the corporation's attorney-client privilege passes with the transfer of substantially all of the corporation's assets and liabilities); *In re Crescent Beach Inn*, 37 B.R. 894 (Bankr. D. Me.), reconsid. denied, 40 B.R. 56 (1984) (holding that the transferee of all the assets of a reorganized company was the debtor's successor for purposes of the attorney-client

---

[3] In the absence of binding Seventh Circuit precedent, we look to out-of-circuit decisions. We are mindful that these out-of-circuit decisions are not binding on this Court. *See AI Marine Adjusters, Inc. v. Forwarding Sys. Int'l*, 1999 U.S. Dist. LEXIS 4659 (N.D. Ill. 1999). However, we find these post-*Weintraub* decisions to be persuasive authority.

privilege and was therefore entitled to assert the privilege formerly held by the debtor); *Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F. Supp. 1460, 1463 (N.D. Ga. 1997) (finding that the authority to assert or waive the old company's attorney-client privilege passed to the new company when it acquired all of the assets and control of the old company during bankruptcy).

However, "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *In re Grand Jury Subpoenas*, 734 F. Supp. at 1211 n.3; *see also, NCL Corp. v. Lone Star Bldg. Ctrs., Inc.,* 144 B.R. at 174 (transfer of a lease did not transfer the attorney-client privilege); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 2003 U.S. Dist. LEXIS 13816 (N.D. Ill. 2003) (sale of certain assets did not transfer the right to invoke the attorney-client privilege despite contract provision stating that the privilege transferred with the sale); *Pilates, Inc. v. Georgetown Bodyworks Deep Muscle Massage Ctrs., Inc.,* 201 F.R.D. 261 (D.D.C. 2000) (assignee of trademarks had no right to assert the attorney-client privilege where there was no transfer of control of the corporation); *SMI Industries Canada, Ltd. v. Caelter Industries, Inc.*, 586 F. Supp. 808 (N.D.N.Y. 1984) (assignment of trademarks and goodwill did not assign attorney-client privilege); *see also, In re In-Store Advertising Sec. Litig.*, 163 F.R.D. at 458; *Sobol v. E.P. Dutton, Inc.*, 112 F.R.D. 99, 103 (S.D.N.Y. 1986).

In *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004), the court found that the mere transfer of some assets does not transfer the attorney-client privilege. However, the court noted that such a "bright-line rule does not apply equally to the myriad ways control of a corporation or a portion of corporation can

change hands." *Id.* Therefore, the court found "the more appropriate rule to be 'whether the attorney-client relationship transfers . . . to the new owners turns on the practical consequences rather than the formalities of the particular transaction.'" *Id.*, citing *Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 674 N.E.2d 663, 668 (N.Y. 1996). The *Soverain* court stated that:

> If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.

Because the plaintiff in *Soverain* not only acquired certain assets but also continued to operate the particular enterprise it purchased, the court found that control of the enterprise, and with it the right to assert the attorney-client privilege, passed to the plaintiff. *Id.*; *see also, Coffin v. Bowater Inc.*, 2005 U.S. Dist. LEXIS 9395, *7-8 (D. Me. 2005).

Based on the case law provided by the defendants and this Court's extensive research, we see no reason to deviate from the well-established principle that the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation. If we examine the practical consequences of the transaction or multiple transactions at issue here, this Court concludes that New FTL is the only entity that acquired the right to assert or waive the attorney-client privilege after bankruptcy. New FTL purchased substantially all of Old FTL's business operations and continues to operate Old FTL's business. Therefore, because the practical consequences of the Asset Purchase Agreement resulted in the transfer of control of Old FTL's business and the continuation of that business under new management, the authority to assert or

waive the attorney-client privilege transferred to New FTL. *Soverain*, 340 F. Supp. 2d at 763.

In contrast, neither the CT nor the SLT emerged from bankruptcy with control of Old FTL's business. As a result of the Joint Plan and the Environmental Settlement Agreement, the Seven Properties were transferred to the CT. Therefore, the CT acquired some of Old FTL's assets but control of Old FTL did not pass to the CT. Similarly, the SLT acquired the stock of NWI-I and purportedly acquired certain rights under the Policy. However, once again, control of Old FTL did not pass to the SLT. While the CT and the SLT control the remediation of the Seven Properties and assets in connection with that remediation, the CT and the SLT simply do not control Old FTL's business. Indeed, defendants concede that they are entities that have no connection to the business operations of the pre-bankruptcy Old FTL or its affiliates. Only New FTL controls Old FTL's business operations. Consequently, only New FTL has the right to assert or waive the corporation's attorney-client privilege. *Soverain*, 340 F. Supp. 2d at 763.

Furthermore, this Court is not persuaded by the fact that both the Custodial Trust Agreement and the Successor Liquidation Trust Agreement include a section that purportedly "vests" the attorney-client privilege in the CT and the SLT with respect to documents and communications transferred to them. Indeed, in *Zenith*, an agreement to transfer the attorney-client privilege was not dispositive. *Zenith*, 2003 U.S. Dist. LEXIS 13816, * 6-7. Instead, in reliance on *Weintraub*, the *Zenith* court noted that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at *5, quoting

11

*Weintraub,* 471 U.S. at 349. Therefore, the court found that the purchaser of some assets did not acquire the right to assert the attorney-client privilege despite a contract provision stating that the privilege transferred with the sale. *Id.* at *6-7.

In short, defendants are asking this Court to divide up the attorney-client privilege based on the assets that the multiple successors of Old FTL acquired as a result of the FTL Bankruptcy. Specifically, they argue that the SLT and the CT retain the attorney-client privilege as it pertains to the environmental condition and remediation of the Seven Properties and that all three defendants retain the attorney-client privilege as it pertains to the Environmental Settlement Agreement and the August 9, 2002 Order. However, defendants have not provided any case law nor has our research revealed any that supports allocating the attorney-client privilege based on the division of a debtor's assets to multiple successor entities. Absent control of the corporation, this Court finds that the attorney-client privilege does not pass to a successor entity, even with respect to the assets that were transferred to that successor. *See Soverain*, 340 F. Supp. 2d at 763. Accordingly, the CT and the SLT are not entitled to assert or waive the attorney-client privilege as it pertains to documents or communications, both pre-bankruptcy or during the bankruptcy, between Old FTL or the FTL debtors and their attorneys. *See Zenith*, 2003 U.S. Dist. LEXIS 13816, * 6-7; *Soverain*, 340 F. Supp. 2d at 763.

Next, we must determine whether NWI-I has the right to invoke the attorney-client privilege. We find it appropriate to analyze NWI-I separately because unlike the CT and the SLT, NWI-I is not a new entity that emerged from the bankruptcy having acquired some of Old FTL's assets. Rather, NWI-I is what is left of Old FTL.

Defendants argue that NWI-I retains the attorney-client privilege as it pertains to the Policy, the Environmental Settlement Agreement and the August 9, 2002 Order.[4]

In support of this argument, defendants argue that this case is similar to *In re I Successor Corp.*, 321 B.R. 640 (Bankr. S.D.N.Y. 2005). We disagree. In that case, after the debtor corporation filed for relief under Chapter 11, it sold substantially all of its assets to another corporation. Pursuant to the asset purchase agreement, the debtor corporation changed its name to I Successor Corporation. As a part of the confirmed plan of liquidation, the Post-Confirmation Committee of Unsecured Creditors of I Successor Corporation ("I Successor" or "plaintiff") was given permission to prosecute preference, fraudulent conveyance and post-petition transfer claims against companies owned by former officers and directors of the debtor corporation. Plaintiff also filed breach of fiduciary duty claims against the former officers and directors. The law firm that had once represented the debtor corporation sought to represent both the companies owned by the former officers and directors as well as the former officers and directors individually. The court granted plaintiff's motion to disqualify the law firm, finding that I Successor was the law firm's former client, albeit renamed.

At the outset, this Court finds that *I Successor* is distinguishable because it involved a conflict of interest. That case is very fact-specific and we decline to extend its limited holding to this case, which involves a completely different fact-specific

---

[4] Defendants contend that one of the assets currently held by NWI-I is the Policy. At the same time, defendants also contend that pursuant to the Environmental Settlement Agreement, the SLT is the legal successor in interest to certain rights in the Policy. Thus, it is not entirely clear if the Policy as an asset of NWI-I or the SLT or both. For purposes of this decision, we will assume that the Policy is an asset of defendant NWI-I.

scenario.  *See Occidental Hotels Mgmt. B.V. v. Westbrook Allegro L.L.C.*, 440 F. Supp. 2d 303, 312 (S.D.N.Y. 2006) (stating that the holding in *I Successor* "is limited to the specific situation of a former counsel of a now-bankrupt corporation seeking to represent an officer or director against his former client, the corporation.").  Moreover, the *I Successor* court did not discuss the general principle that the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation. Nor did the court address whether I Successor retained such control.  As a result, we find that *I Successor* is not persuasive authority.  Because we are not bound by out-of-circuit decisions, we decline to follow *I Successor*.  *See Block v. Rockford Pub. Sch. Dist. # 205*, 2001 U.S. Dist. LEXIS 16339, *4 (N.D. Ill. 2001) (recognizing that out-of-circuit case law is not binding precedent).

Once again, our determination of whether NWI-I has the right to assert or waive the attorney-client privilege hinges on control.  Like the CT and the SLT, NWI-I did not emerge from bankruptcy in control of Old FTL's business operations.  Moreover, defendants have failed to persuade this Court that NWI-I should be permitted to assert the attorney-client privilege absent control of the corporation.  As discussed above, defendants have not provided us with any case law that supports allocating the attorney-client privilege based on the division of a debtor's assets to multiple successor entities.  Accordingly, this Court finds that NWI-I is not entitled to assert or waive the attorney-client privilege as it pertains to documents or communications, both pre-bankruptcy or during the bankruptcy, between Old FTL or the FTL debtors and their attorneys.  *See Zenith*, 2003 U.S. Dist. LEXIS 13816, * 6-7; *Soverain*, 340 F. Supp. 2d at 763.

To the extent that defendants asked this Court to determine who holds the attorney-client privilege in this case, their motion for protective order is granted. However, defendants' motion is denied to the extent that they asked this Court to find that NWI-I retains the attorney-client privilege as it pertains to the Policy, that the SLT and the CT retain the attorney-client privilege as it pertains to the environmental condition and remediation of the Seven Properties and that all three defendants retain the attorney-client privilege as it pertains to the Environmental Settlement Agreement and the August 9, 2002 Order.[5]

**Motion to Compel**

Plaintiff's motion to compel asks this Court to order defendants to review over 19,000 boxes of documents ("the Reebie documents") in order to weed out non-responsive documents and in order to provide responses to interrogatories issued by plaintiff. Plaintiff also asks this Court to compel defendants to review documents in the possession of Milbank in order to fully respond to the interrogatories. Additionally, plaintiff asks us to compel defendants to interview persons with knowledge of information sought in plaintiff's interrogatories, including Old FTL personnel as well as former counsel at Milbank.

**A.      The Reebie Documents**

New FTL acquired the Reebie documents in connection with the purchase of Old

---

[5] Because this Court has found that no defendant has the right to assert or waive the attorney-client privilege with respect to documents and communications between Old FTL or the FTL debtors and their attorneys, there is no need to discuss whether the defendants waived the attorney-client privilege by offering plaintiff unfettered access to documents stored at the Reebie Storage Facility.

FTL's Apparel Business Assets. At some point after the acquisition, New FTL determined that the documents were either not relevant to its current business or were scheduled to be destroyed pursuant to New FTL's document retention policy. When the SLT learned that New FTL planned to destroy the Reebie documents, the SLT agreed to preserve the documents. The SLT did so because it recognized the potential for litigation with plaintiff over the Policy. Accordingly, the SLT arranged for the documents to be shipped from New FTL to the Reebie Storage Facility in Franklin Park, Illinois ("Reebie").

The documents began to arrive at Reebie in the fall of 2003 and continue to arrive as New FTL determines that documents are to be destroyed pursuant to its document retention policy. To date, a total of 19,068 boxes of documents have arrived at Reebie. New FTL provided the SLT with an index of the documents that it shipped to Reebie. New FTL's index listed the box number, the "FOL Year," the "FOL Department," and the "FOL Description." Based on New FTL's index, the SLT's consultant prepared a Master Index of the documents. According to defendants, the Master Index lists: (1) the number of boxes; (2) the date Reebie received the boxes; (3) the Reebie bar code number; (4) an alternative box number; and (5) the FOL Year, FOL Department and FOL Description.

Defendants admit that they have not reviewed the Reebie documents, nor have their agents or attorneys. Defendants claim they have not reviewed these documents because they have no bearing on the remediation of the Seven Properties - the sole reason defendants exist. However, in response to plaintiff's discovery requests, defendants indicated that some of the Reebie documents may be responsive to

16

plaintiff's requests.  Defendants informed plaintiff that they do not have the resources to review the documents.  Consequently, defendants offered plaintiff access to the Master Index and the Reebie documents.[6]

Plaintiff reviewed the Master Index and more than 200 boxes of the Reebie documents.  Plaintiff contends that the Master Index is vague and misleading, that some descriptions are inaccurate and that 1,778 boxes either have no labels or labels that provide no indicia of their contents.  For instance, counsel for plaintiff reviewed a box described as "NWI Subsidiaries Litigation" but the box did not contain any documents relating to litigation.  Instead, the box contained notes and materials relating to annual shareholder meetings in the mid 1990's.  Plaintiff provided five additional examples of boxes with inaccurate or misleading descriptions.

Furthermore, approximately 1,093 boxes are described as "Vanguard Documents" with no description of the contents of those boxes.  Plaintiff believes that this description refers to Vanguard Archive, another storage facility in the Chicago area. These boxes contain no other descriptive or identifying label.  Additionally, approximately 533 boxes are labeled "No Description" and 152 boxes are described with an unexplained series of numbers and/or letters (*e.g.*, 278-5-5).  This Court's review of the Master Index revealed that thousands of entries on the index fail to identify the FOL Department and others fail to identify the FOL Year.  Defendants admitted that they have not reviewed the contents of the boxes to verify that the contents match the

_____

[6] The inconsistency in defendants' positions on the pending motions has not escaped us.  Defendants asked this Court to find that they retained the attorney-client privilege with respect to documents that failed to review and that they allowed plaintiff to review.  We agree with plaintiff that defendants cannot have it both ways.

description provided by New FTL. Plaintiff argues that defendants' document dump has made it impossible for plaintiff to determine whether responsive documents are buried within the thousands of boxes of documents at Reebie.

Defendants claim that they are in no better position than plaintiff to determine the contents of the 19,068 boxes of documents. In particular, defendants argue that: (1) they have met the requirements of Rule 34(b), and (2) forcing them to review the documents would be an undue burden because they do not have the financial resources to do so.

### 1.     Compliance with Rule 34(b)

As an initial matter, we note that the SLT clearly has possession of the Reebie documents and therefore, it must comply with Federal Rule of Civil Procedure 34. Under Rule 34(b), a party who produces documents for inspection must "produce them as they are kept in the usual course of business" or "organize and label them to correspond with the categories in the request." Fed. R. Civ. P. 34(b); *see also, Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004). Defendants argue that they have complied with Rule 34(b) despite the fact that they have not reviewed the Reebie documents because the SLT has produced the documents in the form that they are kept and maintained in the usual course of its business. We disagree.

The SLT has failed to demonstrate that the manner in which the documents are currently kept bears any relation to how they were kept at Old FTL or New FTL. One of the reasons for allowing documents to be produced as they are kept in the usual course of business is to preclude artificial shifting of documents. *In re Sulfuric Acid Antitrust*

*Litig.*, 231 F.R.D. 351, 363 (N.D. Ill. 2005).  As the court noted in *In re Sulfuric Acid*,

> A business has an obvious incentive to keep needed documents in a way that maximizes their usefulness in the day-to-day operations of the business.  That incentive, which is inconsistent with document tampering, vanishes once documents not used with regularity are sent to a storage facility, for then it is no longer essential that they be kept with any degree of organization.

In that case, the court found that corporate documents that had been sent to a storage facility in no particular order were not kept in the "usual course of business" under Rule 34(b).  *Id.*  As a result, the defendants were obligated to organize and label the documents to correspond with the document requests.  *Id.*  The *Sulfuric Acid* court recognized however, that under certain circumstances, the production of documents as they were kept in storage could be proper under the "usual course of business" prong of Rule 34(b).  *Id.*  The court noted that the producing party would have to demonstrate that the way in which the documents are kept in storage has not changed from how they were kept in the usual course of business.  *Id.*  The producing party could make that showing by offering the testimony of a person with knowledge of how the records were originally kept and how they were maintained in storage.  *Id.*

Here, defendants have provided no evidence as to how the Reebie documents were kept in the usual course of Old FTL or New FTL's business.  Like the defendants in the *Sulfuric Acid* case, the SLT has made no meaningful attempt to demonstrate that the Reebie documents are currently kept in the same manner as they were kept by Old FTL and/or New FTL.  Thus, this Court cannot conclude that the Reebie documents are kept in the usual course of business under Rule 34(b).

We recognize that there is some authority for permitting access to warehoused

documents of a bankruptcy debtor as being stored in the "usual course of business."
*See Hagemeyer*, 222 F.R.D. at 598 (documents placed in storage facility by bankruptcy trustee were kept in the usual course of business as the boxes of documents were neatly stacked and clearly labeled); *In re Adelphia Communications Corp.*, 338 B.R. 546, 551-52 (Bankr. D.N.Y. 2005) (where 20,000 boxes of the debtor's corporate records were kept in a separate document archive pursuant to official directives, the court found that they were kept in the "usual course of business.").

However, we find that these cases are distinguishable from the case at hand. In *Hagemeyer*, a corporate debtor's documents were placed in storage by the bankruptcy trustee. *Hagemeyer*, 222 F.R.D. at 598. In *Adelphia*, a corporate debtor's documents were archived pursuant to corporate directives to preserve the records for litigation. *Adelphia*, 338 B.R. at 551-52. The documents in each case were sent from the corporate debtor to the storage facility. In contrast, the Reebie documents were generated by Old FTL, subsequently transferred to New FTL in connection with its acquisition of the apparel business and ultimately, the documents ended up in the SLT's possession at the storage facility. There is no evidence of how these documents were kept, much less that they were kept in the usual course of business, as they were transferred between multiple entities on multiple occasions.

Moreover, in *Adelphia*, the court qualified its ruling "by explicitly stating that in order to satisfy the requirements of Rule 34(b), any archived documents produced must be thoroughly indexed, the boxes accurately labeled and the depository kept in good order." *Adelphia*, 338 B.R. at 551. Here, plaintiff has provided evidence that some of the boxes are inaccurately labeled and that 1,778 boxes either have no labels or labels

that provide no indicia of the contents of those boxes. Furthermore, the SLT did not confirm whether the boxes actually contain documents consistent with the descriptions provided by New FTL. Therefore, plaintiff's concern that there may be responsive documents hidden amidst thousands of boxes of documents is understandable.[7] Under these circumstances, we find that it is not proper under Rule 34(b) to simply provide plaintiff with access to the Master Index and the warehoused documents.

### 2. Undue Burden

Thus, at first glance, it appears that SLT's only other option under Rule 34(b) is to review the documents and then organize and label them to correspond with the document requests. Fed. R. Civ. P. 34(b). Obviously, this would be a massive undertaking with over 19,000 boxes of documents to review. Defendants argue that requiring the SLT (or any of them) to review the Reebie documents would place an undue burden on them. Defendants explain that the SLT has had to borrow money from various trusts that were set up to finance the ongoing remediation of the Seven Properties in order to pay attorneys and environmental consultants retained to defend this case. Defendants also contend that the funds available for this litigation are limited to the amount of those loans, which total approximately $466,000. Defendants claim that NWI-I has no cash and any funds derived from its assets, including the Policy at issue here, belong to the SLT pursuant to the Environmental Settlement Agreement. The CT's assets, aside from the Seven Properties, total approximately $2,600.

---

[7] We note that there is no evidence that any of the defendants intentionally attempted to hide responsive documents. However, the fact that some of the boxes are inaccurately labeled, coupled with defendants' admission that they did not review the boxes, concerns this Court.

According to defendants, if the Court requires the SLT to review the Reebie documents, it would further deplete funds available to remediate the properties.

Defendants also claim that they have no knowledge of Old FTL or New FTL's business operations and therefore, they have no superior ability to sift through the documents to find relevant information. Defendants argue that they are in no better position that the plaintiff to glean relevant information from the mass amount of documents. Like plaintiff, defendants would have to rely on the flawed Master Index as a starting point for their review of the Reebie documents. Additionally, according to Jay A. Steinberg, president of NWI-I, the SLT and the CT, none of the defendants have any employees - only independent contractors retained by the SLT for the sole purpose of remediating the Seven Properties and consulting in this litigation.

"While discovery is often broad, the Federal Rules of Civil Procedure authorize district courts to protect targets of discovery from 'annoyance, embarrassment, oppression, or undue burden or expense.'" *Stagman v. Ryan*, 176 F.3d 986, 993 (7th Cir. 1999), quoting Fed. R. Civ. P. 26(c); *Sullivan v. Conway*, 1995 U.S. Dist. LEXIS 14113, *2 (N.D. Ill. 1995) (recognizing that the policy of broad discovery is counterbalanced by the ability to limit discovery requests that impose undue burden or expense). Furthermore, a court may limit discovery if it determines that the burden of the discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2)(iii); *Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D. 568, 571 (N.D. Ill. 2004). To make such a determination, the courts consider what has been dubbed the proportionality test of Rule 26(b)(2)(iii): the needs of the case, the amount in controversy, the resources of the parties, the importance of the issues at stake in the litigation, and the importance of the proposed

discovery in resolving the issues.  *Id.*  In this way, parties are protected from unduly
burdensome or expensive discovery requests.  *Id.*

With respect to the needs of the case and the importance of the issues at stake
in the litigation, this case involves the limited issue of whether plaintiff is obligated to pay
out benefits under the Policy in connection with the remediation of the Seven
Properties.  However, the amount in controversy is significant in that this dispute
concerns a $100,000,000 policy.  While this Court is not entirely convinced that the
funds available for this litigation are limited to $466,000, we do consider defendants'
resources to be limited in the sense that defendants' assets were allocated to them for
the purpose of remediating the Seven Properties.[8]  Finally, we find that the proposed
discovery is important to a resolution of the issues in this case.

After considering the foregoing factors and the particular circumstances present
here, this Court finds that it would be unduly burdensome and expensive to require the
SLT (or any of the defendants) to review all of the Reebie documents in order to
produce only those documents that are responsive to plaintiff's requests.  Accordingly,
plaintiff's request for such an order is denied.  Nevertheless, this Court finds that plaintiff
is entitled to discover whether the Reebie documents contain relevant information.
Furthermore, we find that it would be equally burdensome, expensive and unfair if we
permitted defendants to rest on their "keys to the warehouse" method of responding to
plaintiff's discovery requests.  We cannot allow defendants to merely offer plaintiff
access to the Reebie documents because doing so shifts the undue burden entirely to

---

[8] At the same time, defendants are sorely mistaken if they think they can litigate over
$100,000,000 policy without spending significant sums of money.

the plaintiff. Therefore, in light of the resources of the parties, the limited issues in this case and the fact that there are more than 19,000 boxes of documents in storage, we find it appropriate to place some limits on discovery related to the Reebie documents. Fed. R. Civ. P. 26(b)(2)(iii) and (c)(2).

Based on the foregoing, this Court orders the parties to work together to create a discovery plan with respect to the Reebie documents. The parties must take into consideration the following: (1) from this point forward, all fees and costs associated with discovery related to the Reebie documents will be shared equally between plaintiff and the defendants; (2) the 1,778 boxes with no labels or labels that do not sufficiently describe their contents should be reviewed to determine whether the boxes contain any relevant information;[9] and (3) the parties should agree upon what additional discovery related to the Reebie documents is necessary, if any, and how long it will take to complete that discovery. By requiring the parties to share the cost, this Court encourages the parties to come up with a discovery plan that is both time and cost efficient. The parties must provide a copy of their proposed discovery plan to chambers, Room 2206, by 2/7/07.

**B.      Remaining Discovery Issues**

Plaintiff also asks this Court for an order compelling defendants to review the Reebie documents in order to provide responses to plaintiff's interrogatories. Again, we find that requiring defendants to do so would be unduly burdensome and expensive.

---

[9] The parties should determine which party will review these boxes. If, upon review of the 1,778 boxes, the reviewing party discovers additional boxes that are inaccurately labeled, that party should inform the Court.

Accordingly, plaintiff's motion to compel defendants to review the Reebie documents in order to fully respond to their interrogatories is denied.

Next, plaintiff asks this Court to compel defendants to interview third parties who might have knowledge of information sought in plaintiff's interrogatories, including Old FTL personnel as well as former counsel at Milbank. Under Rule 33, each interrogatory must be "answered separately and fully in writing under oath, unless it is objected to, in which event the objecting party shall state the reasons for objection and shall answer to the extent the interrogatory is not objectionable." Fed. R. Civ. P. 33(b)(1). Thus, Rule 33 imposes a duty to provide full answers to interrogatories, including all the information within the responding party's knowledge and control. *Bell v. Woodward Governor Co.*, 2005 U.S. Dist. LEXIS 4451, *6 (N.D. Ill. 2005).

Plaintiff argues that a party responding to an interrogatory must make reasonable efforts to obtain information within the knowledge or possession of others. In support of this argument, plaintiff relies on *Hanley v. Como Inn, Inc.*, 2003 U.S. Dist. LEXIS 7130 (N.D. Ill. 2003). There, the court stated that "personal lack of knowledge does not excuse [a party's] failure to answer the interrogatories, because [the] duty to fully answer implies a duty to make reasonable efforts to obtain information within the knowledge and possession of others." *Id.* at *12, quoting *Jones v. Syntex Laboratories, Inc.*, 2001 U.S. Dist. LEXIS 17926, *9 (N.D. Ill. 2001). We disagree that such a broad proposition applies universally. Indeed, in *Jones*, the information at issue was within the possession of the plaintiff's family members. *Jones*, 2001 U.S. Dist. LEXIS 17926, *9. In *Hanley*, plaintiff's motion to compel was granted only to the extent that the defendant was required to identify the documents he relied on in answering the interrogatories.

25

*Hanley*, 2003 U.S. Dist. LEXIS 7130, *13.  The motion to compel had nothing to do with requiring a party to obtain information within the knowledge or possession of others.  *Id.* at *12-13.

This Court finds that under Rule 33, a responding party is required to provide full answers to interrogatories, which includes all information within that party's knowledge and control.  *See Portis v. City of Chicago*, 2005 U.S. Dist. LEXIS 7972, *10 (N.D. Ill. 2005); *Bell*, 2005 U.S. Dist. LEXIS 4451, *6 (N.D. Ill. 2005).  Because the defendants have no control over the former officers, directors or employees of Old FTL or any other successor of Old FTL or NWI, plaintiff's motion to compel defendants to interview third parties not within their control is denied.

Similarly, we will not order defendants to interview former counsel at Milbank or review documents in the possession of Milbank.  As discussed above, none of the defendants have the right to assert or waive the attorney-client privilege with respect to documents or communications between Old FTL or the FTL debtors and their attorneys.  Therefore, the attorneys at Milbank are not within the defendants' control.  Accordingly, plaintiff's motion to compel defendants to review Milbank documents and interview former counsel is denied.

**Conclusion**

To the extent that defendants asked this Court to determine whether they are entitled to assert or waive the attorney-client privilege in this case, their motion for protective order is granted.  However, for the reasons set forth above, we find that none of the defendants are entitled to invoke the attorney-client privilege here.  Thus, the remainder of defendants' motion for protective order is denied.  Plaintiff's motion to

26

compel is granted to the extent that the parties are ordered to create a discovery plan

relating to the Reebie documents.  Plaintiff's motion to compel is denied in all other

respects.  It is so ordered.

**ENTER:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: January 16, 2007**